# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**BREANNA LEDOUX**                                          **CIVIL ACTION**

**VERSUS**                                                         **NO. 14-477-SDD-RLB**

**CAROLYN W. COLVIN,**
**ACTING COMMISSIONER**
**OF THE SOCIAL SECURITY**
**ADMINISTRATION**

## NOTICE

Please take note that the attached Magistrate Judge's Report and Recommendation has been filed with the Clerk of the U.S. District Court for the Middle District of Louisiana.

Under 28 U.S.C. § 636(b)(1), you have **14 days** from receipt of this Notice to file written objections to the proposed findings of fact and conclusions of law in the Magistrate Judge's Report. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on August 31, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**BREANNA LEDOUX**                                              **CIVIL ACTION**

**VERSUS**                                                            **NO. 14-477-SDD-RLB**

**CAROLYN W. COLVIN,**
**ACTING COMMISSIONER**
**OF THE SOCIAL SECURITY**
**ADMINISTRATION**

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff, Breanna LeDoux (Plaintiff), seeks judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) pursuant to 42 U.S.C. § 405(g) upholding the cessation of Plaintiff's supplemental security income. (R. Doc. 1). Having found all of the procedural prerequisites met (Tr. 4-6), the Court has properly reviewed Plaintiff's appeal. *See* 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you . . . file an action in Federal district court . . . ."). For the reasons given below, the Court **RECOMMENDS** that the decision of the Commissioner be **VACATED** and Plaintiff's appeal be **REMANDED** for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff was awarded childhood benefits on August 1, 2004 for mental retardation and attention deficit hyperactivity disorder. (Tr. 172). On June 3, 2011, Plaintiff's childhood benefits

were ceased after a redetermination finding Plaintiff was no longer entitled to benefits. (Tr. 67-69). Plaintiff appealed the redetermination, claiming she was disabled due to mental impairments. (Tr. 97). A hearing was held before an Administrative Law Judge on January 30, 2013. (Tr. 26-64). Plaintiff, represented by counsel, appeared and testified. (Tr. 28-52). A vocational expert also provided testimony. (Tr. 61-63).

The ALJ issued an unfavorable decision on March 8, 2013 (Tr. 12-21), finding Plaintiff's disability ended on June 1, 2011 and she had not become disabled since that date. Plaintiff's request for review was denied by the Appeals Council on February 27, 2014. (Tr. 4-6). The ALJ's decision rested as the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. *See* 20 C.F.R. § 404.981.

## II.     STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (defining "substantial evidence" in the context of the National Labor Relations Act, 29 U.S.C. § 160(e)). The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)

(quotations omitted).  Conflicts in the evidence are for the Commissioner "and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).  The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision.  *See, e.g., Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994) ("This is so because substantial evidence is less than a preponderance but more than a scintilla."); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988) ("we must carefully scrutinize the record to determine if, in fact, such evidence is present; at the same time, however, we may neither reweigh the evidence in the record nor substitute our judgment for the Secretary's"); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (same).

If the Commissioner's decision is supported by substantial evidence, then it is conclusive and must be upheld.  *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000).  If the Commissioner fails to apply the correct legal standards, or fails to provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

## III.    ALJ'S DETERMINATION

In determining disability, the Commissioner (through an ALJ) works through a five-step sequential evaluation process.  *See* 20 C.F.R. § 404.1520(a)(4).  The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability.  If the claimant is successful in sustaining his or her burden at each of the first four steps, the burden shifts to the Commissioner at step five. See Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991) (explaining the five-step process).  First, the claimant must prove he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  Second, the claimant must prove his or her

impairment is "severe" in that it "significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). At step three the ALJ must conclude the claimant is disabled if he proves that his or her impairments meet or are medically equivalent to one of the impairments contained in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(d) (step three of sequential process); 20 C.F.R. pt. 404, subpt. P, app'x 1 (Listing of Impairments). Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his or her past relevant work. 20 C.F.R. § 404.1520(f).

If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he or she is capable of performing other work. 20 C.F.R § 404.1520(g)(1). If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

The ALJ made the following determinations:

1. Plaintiff received social security income benefits as a child. On June 1, 2011, Plaintiff was notified that she was no longer disabled based on a redetermination of disability under the rules for adults who file for benefits.

2. Since June 1, 2011, Plaintiff suffered from the following severe impairments— intermittent explosive disorder, personality disorder, back problems.

3. Since June 1, 2011, Plaintiff's impairments did not meet or medically equal the severity of a listing—specifically, Listing 12.04 and 12.08.

4. Plaintiff had the residual functional capacity (RFC) to perform light work with one, two and three-step instructions requiring only occasional interaction with others.

5. Plaintiff did not have any past relevant work.

6. Plaintiff was a "younger individual" between the ages of 18 and 49.

7.     Plaintiff had a limited education and could communicate in English.

8.     The transferability of job skills was not an issue in the absence of any past relevant work.

9.     Considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs existing in the national economy.

10.    Plaintiff has not been under a disability between January 1, 2011 and Plaintiff has not become disabled since that date.

(Tr. 14-21).

## IV.     PLAINTIFF'S ASSIGNMENTS OF ERROR

Plaintiff raises several arguments in support of her appeal. First, Plaintiff suggests the ALJ "failed to apply an appropriate legal standard at Step 3 by neglecting to consider whether Plaintiff's impairment met § 12.05(C) of the Listing of Impairments." (R. Doc. 12-1 at 8-11). Plaintiff next contends that that the "ALJ erred by failing to incorporate a wide-range of moderate limitations (which he accepted) in his hypothetical to the vocational expert. The ALJ did not supply the VE with information adequate to determine Plaintiff's ability to sustain competitive employment." (R. Doc. 12-1 at 11-15). Because the contested hypothetical was eventually adopted as Plaintiff's RFC, Plaintiff ultimately challenges the existence of substantial evidence to support the RFC. Finally, Plaintiff claims that the Appeals Council erred in not considering newly submitted evidence. According to Plaintiff, the evidence submitted to the Appeals Council contained objective findings that are inconsistent with the RFC and warrant remand. (R. Doc. 12-1 at 16-17).

Because the Court finds remand is warranted based on the ALJ's RFC assessment, it does not address Plaintiff's argument concerning step three of the evaluation.

## V.  DISCUSSION

### A.  Appeals Council

Plaintiff argues that the Appeals Council committed reversible error by not evaluating "probative" new evidence that was provided by Plaintiff, as "this evidence included objective findings as to severely impaired insight, judgment and impulse control; a very childlike presentation; paranoid thought content with poor focus and concentration; and a diagnosis of mild mental retardation." (R. Doc. 12-1 at 17).  In its Order denying review, the Appeals Council explained that it "considered" Plaintiff's additional evidence but found the evidence did "not provide a basis for changing the [ALJ's] decision." (Tr. 4-5).  Relying on *Epps v. Harris*, 624 F.2d 1267 (5th Cir. 1980), Plaintiff contends that "when a Claimant properly presents new evidence and the [Appeals Council] denies review, it <u>must</u> show in it's [sic] written denial that it has adequately <u>evaluated</u> the evidence." (R. Doc. 12-1 at 16).  Therefore, the Appeals Council's failure to discuss Plaintiff's newly submitted evidence and its use of "purely generic boilerplate language" was erroneous and warrants remand. (R. Doc. 12-1 at 16-17).

In *Epps*, 624 F.2d at 1273, the Fifth Circuit reversed the Secretary after finding that the Appeals Council had "perfunctorily adhered to the decision of the hearing examiner" instead of "adequately evaluat[ing]" the claimant's newly submitted evidence.  "The failure alone," the Fifth Circuit explained, "makes us unable to hold that the Secretary's findings are supported by substantial evidence and requires us to remand this case for a determination . . . reached on the total record." *Id.*  While, at first glance, *Epps* appears consistent with Plaintiff's argument, it is inapplicable to the instant case.

*Epps* involved a decision by the Appeals Council to affirm and adopt the ALJ's decision, rather than the Appeals Council's denial of a request for review. *Epps*, 624 F.2d at 1273; *see also*

*Sun v. Colvin*, 793 F.3d 502, 2015 WL 4393795, at *7 (5th Cir. 2015) (rejecting a similar

argument and distinguishing *Epps* as inapposite to the claimant's case in which the AC denied

his request for review); *Parks v. Comm'r of Soc. Sec. Admin.*, 783 F.3d 847, 853 (11th Cir. 2015)

(Because *Epps* "arose in a different procedural context, where the Appeals Council *affirmed*" the

ALJ's decision, *Epps* "has little bearing on a denial of a request for review.").  Because the

Appeals Council denied Plaintiff's request for review, *Epps* is inapplicable.

When a claimant requests review, the "Appeals Council may deny [the] request for

review or it may decide to review [the] case and make a decision." 20 C.F.R. § 404.981.  "When

the Appeals Council makes a decision," like it did in *Epps*, "it will follow the same rules for

considering opinion evidence as administrative law judges follow." 20 C.F.R. § 404.1527(e)(3);

*see also Sun*, 793 F.3d at *7 (citing *Meyer v. Astrue*, 662 F.3d 700, 706 (4th Cir. 2011) ("Only if

the Appeals Council grants a request for review and issues its own decision on the merits is the

Appeals Council required to make findings of fact and explain its reasoning.")).  In that situation,

the decision of the Appeals Council acts as the final decision of the Commissioner — not the

decision of the ALJ. 20 C.F.R. § 404.981.  By contrast, when the Appeals Council denies a

claimant's request for review, as it did in Plaintiff's case, "the denial becomes part of the

Commissioner's final decision," *Sun*, 793 F.3d at *7; but, the ALJ's decision will rest as final. 20

C.F.R. § 404.981.

The regulations specifically permit claimants requesting review before the Appeals

Council to submit additional evidence, not before the ALJ. 20 C.F.R. §§ 404.968(a), 404.970(b).

In those cases, the Appeals Council must consider and evaluate any "new and material" evidence

submitted, if it "relates to the period" at issue. 20  C.F.R. § 404.970(b).  For purposes of this

appeal, the Court assumes Plaintiff's additional evidence submitted to the Appeal's Council constitutes new and material evidence. (Tr. 7, 346-557).[1]

After "evaluat[ing] the entire record including the new and material evidence," if the Appeals Council finds that the ALJ's conclusion is contrary to the weight of the current record evidence, it will grant the request for review and either issue a decision or remand the case to the ALJ. 20 C.F.R. §§ 404.967(b), 404.979. But if the weight of the evidence is still consistent with the ALJ's decision, the Appeals Council can simply deny the request for review. Contrary to Plaintiff's contention, nothing in the Act or regulations requires that the Appeals Council provide a discussion of the newly submitted evidence or explain its rationale for denying review. Instead, the neither the Fifth Circuit's opinion in *Epps*, nor the Act itself, requires the Appeals Council to do anything more than what it did here — state that it considered new and material evidence in deciding whether to grant review. (Tr. 4, 7).[2]

The evidence that Plaintiff provided to the Appeals Council was made part of the Administrative Record and the Court must consider it, along with the evidence before the ALJ,

---

[1] Plaintiff has submitted treatment records from two separate psychiatric hospitalizations, the second of which occurred between March 26 and March 29 of 2013 — after the ALJ's March 8, 2013 decision. (Tr. 350-86). Defendant suggests that this evidence is of no consequence because it is "dated after the ALJ's decision." (R. Doc. 15 at 11). The evidence, however, is properly before the Court and must be considered. When the Appeals Council reviews a decision "based on an application for benefits," evidence submitted to the Appeals Council must relate to the period on or before the ALJ's decision. 20 C.F.R. § 416.1476(b)(1). The instant decision, however, concerns the cessation of previously awarded SSI benefits. (Tr. 138-39). "In reviewing [SSI] decisions other than those based on an application for [SSI] benefits," like the one at issue here, "the Appeals Council will consider the evidence in the administrative law judge hearing record and any additional evidence it believes is material to an issue being considered." 20 C.F.R. § 416.1476(b)(2); 20 Fed. Reg. 4001, 4003 (Feb. 9, 1987) ("In Title XVI cases not based on an application for benefits (e.g., cases involving suspension or termination of benefits) . . . ."). In other words, "the AC will consider additional evidence regardless of whether it relates to the period ruled on by the ALJ or to a subsequent period." 52 Fed. Reg. 4001, 4003 (Feb. 9, 1987) (codified at 20 C.F.R. § 416.1476(b)(2)). And so, Plaintiff's March 2013 treatment records will be considered by the Court.

[2] The decision of the Appeals Council stated: "[W]e considered . . . the additional evidence listed on the enclosed Order of Appeals Council. . . . We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 4-5). Nothing more is required. *See Cantrell v. McMahon*, 227 F. App'x 321, 323 (5th Cir. 2007) (Appeals Council adequately considered newly submitted evidence where "In its order, the Appeals Council specifically stated it had considered the additional evidence and found it did not warrant changing the ALJ's disability decision.").

to determine whether substantial evidence supports the final decision of the Commissioner. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). The newly submitted evidence detailed two separate in-patient hospitalizations for psychiatric treatment occurring shortly before and after the ALJ rendered his March 8, 2013 decision — February 8, 2013 to February 12, 2013 and March 26, 2013 to March 29, 2013 (Tr. 350-86, 388-557). These newer treatment records provide a better "longitudinal" view of Plaintiff's condition, which is "vital" to the consideration of mental impairments. 20 C.F.R. § 416.920a(c)(1); Listing 12.00(D)(2).

As discussed below, the administrative record before this Court does not contain substantial evidence supporting the RFC or the ALJ's ultimate decision that Plaintiff could perform work on a sustained basis. The Court considers Plaintiff's February and March 2013 treatment records to be "significant" as they conflict with certain evidentiary findings made by the ALJ, "cast[ing] doubt on the soundness" of the ALJ's decision. *Sun*, 793 F.3d at *8. Although the Appeals Council was not required to, it did not provide an evaluation of this evidence. Therefore, the "uncertainty" created by the conflict between this newer evidence and parts of the ALJ's decision "has not been addressed by a factfinder below." *Sun*, 793 F.3d at *8. Resolution of this conflict requires a reweighing of the evidence — something the Court is not permitted to do on judicial review. *Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001). And so, remand is warranted for consideration of this newer evidence.

**B.      Substantial Evidence Does Not Support the RFC or the ALJ's Ultimate Finding that Plaintiff Can Sustain Employment**

The ALJ is responsible for determining a claimant's residual functional capacity (RFC). *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making this determination the ALJ must consider all the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the claimant's ability, despite any physical

and mental limitations. *Loza*, 219 F.3d at 393 ("The inquiry here is whether the record, read as a whole, yields such evidence . . . ."). However, the ALJ may not establish physical limitations or lack of limitations without the support of medical evidence. *Patterson v. Astrue*, No. 08-13, 2008 WL 5104746, at *4 (N.D. Miss. Dec. 1, 2008). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but are not conclusive when derived by ignoring evidence, misapplying the law or judging matters entrusted to experts." *Nyugen v. Chater*, 172 F .3d 31, 35 (1st Cir. 1999) (citation omitted). Ultimately, the ALJ must "consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza*, 219 F.3d at 393.

During the hearing, the ALJ asked the Vocational Expert (VE) two separate hypothetical questions. The first hypothetical assumed Plaintiff had the ability to perform the exertional demands of light work and

> [B]ecause of emotional components, she couldn't perform complex or detailed work anymore, but she could do simple type jobs requiring one, two and three-step instructions. And in addition, she would require work in an environment with only occasional interaction with others where she's more comfortable working with things rather than people.

(Tr. 62). In response to hypothetical number one, the VE responded that Plaintiff would still be capable of performing substantial gainful activity, listing certain jobs available in substantial numbers. (Tr. 62-63). The second hypothetical included these same limitations, but added:

> If Ms. Ledoux had an emotional problem which might be intermittent like episode - - episodic periods of anger and if they didn't occur everyday, but if they occurred maybe four or five days in a month and you couldn't predict those days, and on those days, you couldn't complete a workday or attend a job, could she do these jobs or any other jobs on a sustained basis?

(Tr. 63). The VE responded that these limitations would preclude any type of gainful employment on a sustained basis.

In his opinion, the ALJ adopted an RFC containing limitations consistent with hypothetical number one. Specifically, the ALJ determined that Plaintiff had the RFC to perform the exertional demands of light work involving "one, two, and three-step instructions" and "requiring only occasional interaction with others." (Tr. 18). Although the ALJ did not explicitly find Plaintiff capable of performing work on a sustained basis, this finding is inherently subsumed in an RFC. *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). And in this case, it is more obvious given the ALJ's omission of the additional limitations included in hypothetical number two.

In finding Plaintiff capable of working on a sustained basis, the ALJ highlighted the fact that "mental health records dated in November 2012 to January 2013 reveal[ed] the claimant was doing better" following a psychiatric hospitalization in late October of 2012. (Tr. 16, 293-325, 328-343). "Regarding her mental impairments," the ALJ additionally "note[d] that the claimant was given a fair prognosis if she is compliant with her medications," before finding that "there appears to be a large volitional element to the claimant's behavior." (Tr. 19, 214, 263).

Plaintiff contends that substantial evidence does not exist because the ALJ ignored or rejected evidence indicating an inability "to function independently, effectively, and on a sustained basis" in the workplace. (R. Doc. 12-1 at 11). According to Plaintiff, the record supports "limitations" in "punctuality and attendance due to episodic yet severe symptoms." (R. Doc. 12-1 at 13). These limitations were not included in the ALJ's first hypothetical to the VE, which was eventually adopted as the RFC. (R. Doc. 12-1 at 13). Plaintiff additionally argues that her February and March 2013 treatment records offer further support of her inability to sustain competitive employment. (R. Doc. 12-1 at 17).

In his discussion of the medical evidence, the ALJ noted an improvement in Plaintiff's symptoms from November of 2012 through January of 2013 following a psychiatric hospitalization in October of 2012, as evidence of her ability to work. Plaintiff was hospitalized between October 22, 2012 through October 26, 2012, after she threatened "to kill her mother and sister" and "put a knife to her throat." (Tr. 317). Plaintiff's mother called her treating therapist on October 22, 2012 "to report" that Plaintiff "threatened to stab her sister (who is 9 months pregnant) and her mother." (Tr. 282); (Tr. 317) ("Patient stated . . . 'If you don't shut your mouth I am going to slaughter you both with a knife."). Throughout the call, Plaintiff "was in the background yelling." (Tr. 282). At the instruction of her therapist, Plaintiff's mother brought her to the emergency room for "evaluation and possible admission." (Tr. 282). Upon admission, Plaintiff reported that she had "been screaming at people all day," but "she [couldn't] control it"; she admitted, "I don't know what's wrong with me." (Tr. 317).

During her October 2012 in-patient treatment, doctors reported a history of psychiatric admissions and "aggressive behaviors." (Tr. 296, 319). Plaintiff explained that she was expelled from school in the 8th grade and sent to "YCP – Youth Council Program" for 6 months after she "choked another student and almost killed him." (Tr. 299). Plaintiff had two previous psychiatric hospitalizations following attempts to commit suicide by overdosing. (Tr. 301). She described "difficulties with both making and keeping friends." (Tr. 307). Plaintiff also reported that "she sees spiders and bugs and sometimes falls out of bed because she thinks that they are trying to get revenge on her." (Tr. 320).[3]

During treatment, doctors observed a disheveled appearance, depressed and flat affect, poor impulse control, mood changes, impulsivity and aggressive behaviors." (Tr. 319). Doctors

---

[3] On August 1, 2012 and August 14, 2012, Plaintiff similarly told her treating therapist that she "sees visions of her deceased uncle and spiders," as well as figures standing over her bed. (Tr. 267, 275).

determined that Plaintiff was a danger to herself and had engaged in "self injurious behavior (Patient reports that she has been banging her head against the wall and punching the floor.)." (Tr. 319). Homicidal ideations were present and Plaintiff was labeled as a risk to others. (Tr. 319-20). Upon her October 26, 2012 discharge, Plaintiff was diagnosed with impulse disorder, mood disorder, "stressors related to limited coping skills, secondary to limited intellectual ability and conflicts with her sister." (Tr. 297).

While the ALJ discussed Plaintiff's October 2012 hospitalization, he found that "[u]pdated mental health records dated in November 2012 to January 2013 reveal the claimant was doing better since her hospitalization." (Tr. 16, 329).[4] The newly submitted treatment records from just the following months, however, show a relapse of Plaintiff's symptoms and an increase in the severity of Plaintiff's mental impairments. (Tr. 350-86, 388-557).

Plaintiff presented to the emergency room at Prevost Memorial Hospital on February 8, 2012 with "severe" mood swings and agitation, auditory hallucinations and suicidal ideation — Plaintiff threatened to kill herself, putting a knife to her throat. (Tr. 401-05). Emergency room doctors issues a "PEC" (Physician's Emergency Certificate) recommending that Plaintiff be involuntarily committed for psychiatric treatment. At the time of admission, Plaintiff had been refusing to take her medications for 3 days. (Tr. 422, 441). Emergency room doctors at Prevost

---

[4] Plaintiff regularly sought treatment for her mental impairments throughout the relevant time period. And while her treating therapist did note improvements in Plaintiff's condition following her hospitalization in October of 2012, she was not without symptoms. (Tr. 329) (On November 7, 2012, Plaintiff was "doing better" after October hospitalization, but she still had mood swings that were "disturbing to mother."); (Tr. 328) (On November 7, 2012, Plaintiff's mother reported: "[S]he will get angry with no apparent reason or trigger, and one time last week she threatened to cut her throat."); (Tr. 332) (On December 5, 2012, Plaintiff's therapist reported that she tried to overdose on Tylenol the night of Thanksgiving, she "punched a wall several times last week," and "has been having daily crying spells and is easily agitated and angry."); (Tr. 335) (On December 12, 2012, Plaintiff's therapist notes that she "has reportedly been a little calmer . . . Pt was angry a few days ago and broke things in her room."); (Tr. 337) (Therapy notes from December 26, 2012 relay that Plaintiff took "6 Klonopin and 6 Ibuprofen last Thursday. Her mother took her to Prevost ER, and all of her bloodwork was wnl."); (Tr. 342) (On January 16, 2013, Plaintiff's therapist relays that Plaintiff "had a verbal altercation with neighborhood kids and was threatened by police with harassment"); (Tr. 343) (On January 22, 2013, Plaintiff's mother reported a physical altercation between Plaintiff and her sister. Plaintiff's mother also explained that Plaintiff had been "yelling, hitting the walls, and very argumentative.").

Memorial likewise reported that Plaintiff kept coming to the nurses' station requesting that her PEC be destroyed to avoid in-patient treatment. (Tr. 546).

In short, Plaintiff's February 2013 in-patient treatment records document observations of "retarded" and "very child-like" behavior; isolation; irritability ("easily angered"); racing and pressured speech; rambling and illogical thoughts; "severely impaired" judgement; "severely impaired" insight; "severely impaired" impulse control; poor concentration; suicidal and homicidal ideations; hallucinations; and paranoid delusions. (Tr. 401, 403, 404, 433, 437, 440, 443, 446). Plaintiff's affect and mood were often characterized as "labile." (Tr. 437, 440, 443). On February 8, 2013, Plaintiff was described as having "impaired judgment" and being "unable to see solution." (Tr. 414). Plaintiff had "limited" interactions with her peers which were at times described as "pressured," "isolative" and "inappropriate." (Tr. 434, 440, 481). Hospital personnel reported that Plaintiff was "irritable with staff at times" (Tr. 440) and that she "becomes irritable if demands not met." (Tr. 437).

Throughout her in-patient treatment, Plaintiff complained of medication side effects (Tr. 434, 437, 440, 443, 462), refused to take medications (Tr. 440, 462) and was non-compliant with group therapy sessions (Tr. 475, 477-78). This behavior is consistent with other record evidence of non-compliance. (Tr. 267). Treatment records from February 9, 2013, consistently describe Plaintiff as having poor insight into her hospitalization. (Tr. 434).

On February 10, 2013, Plaintiff's mother told doctors that Plaintiff had been in two physical/verbal altercations since October of 2012 – "any little thing sets her off." (Tr. 441); (Tr. 342) (January 16, 2013 treatment notes from Plaintiff's treating therapist report that Plaintiff "had a verbal altercation with neighborhood kids, and was threatened by the police with harassment"). According to her mother, Plaintiff still becomes upset, but to a lesser degree,

when she regularly takers her medication.  When Plaintiff is upset, she will beat her head against the wall, scream and curse.  Due to multiple overdose attempts, Plaintiff's mother had begun locking up her medications. (Tr. 441).

Plaintiff's prognosis was "guarded" and doctors described her as being a danger to both herself and others during her February hospitalization. (Tr. 404, 405).  She was consistently noted as being in "danger of grave disability due to major impairments in" - - thinking (illogical), mood (labile), functioning (impulsive, poor insight/judgment, mild mental retardation, somatic), and social skills (isolative). (Tr. 434, 437, 440, 443, 446, 449).  Upon discharge, she was diagnosed with Intermittent Explosive Disorder, Schizophrenia, Mild Mental Retardation, Educational Problems and Social Environment Problems. (Tr. 432).

Between March 26, 2013 and March 29, 2013, Plaintiff was again involuntarily committed for in-patient psychiatric treatment. (Tr. 350-86).  At intake, Plaintiff's mother informed doctors that Plaintiff had been "acting up for the past 2 weeks" since getting into a physical altercation with a neighbor, which left Plaintiff with a "black eye." (Tr. 359).  According to her mother, Plaintiff's prescription for Geodon was reduced a month earlier and she has "had problems" since that time — Plaintiff had been "pulling out knives" and threatening to kill herself, forcing her mother to "lock up all the knives." (Tr. 359).  Although Plaintiff claimed to be compliant with her medications, her mother reported that Plaintiff has been refusing to take Trazadone and had thrown her medications away on the morning she was admitted. (Tr. 358).  Plaintiff's mother relayed that her daughter "has a difficult time controlling and maintaining her anger" (Tr. 350) and that she was "afraid for [Plaintiff's] safety." (Tr. 359).  Plaintiff additionally reported "auditory hallucinations telling her to kill herself and others," which become worse when she is angry. (Tr. 372, 376). "She also admitted to cutting again . . . .

She had numerous superficial cuts to her left wrist."(Tr. 358). Plaintiff's chronic mental illness and problems with her primary support group, social environment and peers were considered "major life-area stressors." (Tr. 371). Because of her "past" and "current psychiatric diagnos[e]s," history of suicide attempts, "self injurious behavior" and lack of social support, doctors found Plaintiff was a risk to herself. (Tr. 372). Her "history of aggressive behavior, impulsivity, lack of social support, poor judgment, [and] homicidal ideations," made Plaintiff a risk to others. (Tr. 372). Treating doctors observed guarded behavior, poor memory and impulse control, slowed thought processes, irritability, mood changes, diminished concentration, angry outbursts, impaired insight, poor judgment, poor frustration tolerance, and poor coping skills (Tr. 353, 371, 372, 383). At discharge, Plaintiff was diagnosed with impulse control disorder, "suspect borderline personality disorder, suspect borderline IQ, social stressors, poor frustration tolerance, and poor coping skills." (Tr. 377).

This evidence of relapses in Plaintiff's condition and repeated psychiatric hospitalizations is significant because it is contrary to the ALJ's finding of improvement in Plaintiff's condition after her October 2012 psychiatric hospitalization. (Tr. 16). *See Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) ("[I]t is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased. Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods."). This evidence also casts doubt on Plaintiff's ability to sustain employment.

This newer evidence provides a longitudinal view of Plaintiff's mental impairments, highlighting severely impaired insight, judgment and impulse control, a history of aggressive behavior, ineffective coping skills, current aggressive behavior, homicidal and suicidal ideation, inappropriate and pressured interactions with peers, hallucinations and paranoid delusions. *See*

*Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986) (Substantial evidence did not support finding that claimant could maintain employment where "his judgment was impaired, his insight into his problems was poor, his ability to relate to others was impaired"; prognosis was "guarded"; and "[h]e has been hospitalized repeatedly over a long period of time for psychiatric problems, and the record is replete with discussions of his inappropriate behavior and poor social adjustment."); *Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001) (ALJ's finding that claimant could sustain employment was not supported by substantial evidence where "Hutsell's records show that she is subject to erratic periods of breakdown, that she suffers from moderate to complete impairment in work-related skills.").

Nonetheless, "no fact finder has made findings regarding" this evidence "or attempted to reconcile these [treatment notes] with other conflicting and supporting evidence in the record." *Sun*, 793 F.3d at *8. "Assessing the probative value of competing evidence is quintessentially the role of the fact finder," not the Court. *Id.* For this reason, the Court is unable to determine whether substantial evidence exists to support the RFC and the ultimate finding that Plaintiff could sustain work. The Court must remand Plaintiff's case for consideration of Plaintiff's impairments and her ability to sustain work, in light of this newer evidence.

As a final matter, the Court notes that the ALJ also found Plaintiff capable of sustaining work because her prognosis was fair if she was compliant with treatment. (Tr. 20). Additionally, the ALJ attributed Plaintiff's non-compliance (and psychotic behavior) to her own volition, as opposed to a mental impairment. Therefore, Plaintiff's ability to perform work consistent with the RFC is dependent on her ability to comply with prescribed treatments. *See Clark v. Astrue*, 2013 WL 105017, at *7 (S.D. Tex. Jan. 8, 2013) (ALJ erred when assuming claimant's

noncompliance "was based on free choice, and crafted an RFC that was dependent upon compliance with treatment").

To begin, Plaintiff's treatment records from February and March of 2013 are inconsistent with Plaintiff's earlier prognosis from August 1, 2012 of "fair if compliant," which was relied on by the ALJ. (Tr. 20); (Tr. 263) (Following his initial examination of Plaintiff on August 1, 2012, her treating therapist, Dr. Ravindra Reddy, opined that Plaintiff's prognosis was "fair if compliant."). By contrast, Plaintiff's prognosis was assessed as "guarded" during both her February 2013 and March 2013 hospitalizations. This prognosis was likewise not qualified on her compliance with medications. (Tr. 383, 404-05). This conflict in the evidence is substantial as it concerns a finding specifically relied on by the ALJ in formulating Plaintiff's RFC. For that reason, this conflict must also be resolved by the ALJ on remand.

Moreover, the ALJ substituted his own opinion for that of Plaintiff's doctors when finding her behavior and non-compliance were volitional, without citing to any record evidence to support this finding. (Tr. 20). "Several appellate courts have recognized that a mental impairment can be the cause of noncompliance with treatment." *Clark*, 2013 WL 105017, at *6. Here, Plaintiff's treatment records indicate that she has a "limited awareness of illness" (Tr. 273); severely impaired judgment, insight and impulse control (403, 433); downplayed her symptoms to avoid treatment (Tr. 546); and consistently refused treatment and been noncompliant with medications. (Tr. 267, 358, 422, 434, 437, 440, 441, 443,446, 462, 475, 478). Moreover, none of Plaintiff's doctors have attributed these symptoms and behaviors to Plaintiff's free will.

On remand, the ALJ should consider whether Plaintiff's noncompliance with prescribed treatments results from her mental impairment. *Clark*, 2013 WL 105017, at *6 (Remand was

warranted where ALJ "found (without citation to the record)" that claimant's behavior and "past noncompliance was volitional," as opposed to being a result of his mental impairment.); *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (The ALJ erred in relying on evidence that claimant could work when she took her medicine. The ALJ failed to consider that "mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."); *Pate-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009) (The ALJ's determination that claimant's psychotic behavior caused by "medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law."); *Mazza v. Astrue*, 2013 WL 690387, at *9 (W.D. Wash. Feb. 1, 2013) (The ALJ found that claimant's mental limitations and symptoms resulted from a lack of "motivation[]," as opposed to his mental impairments. Because the ALJ did not cite to any supporting medical evidence, the court reversed the ALJ, as "this finding is based on the ALJ's own interpretation of plaintiff's mental impairments and limitations."); *Prince v. Colvin*, 2015 WL 410338, at *6 (W.D. Wis. Jan. 29, 2015) (The ALJ "play[ed] doctor" when determining claimant with mental impairments "maintained control over her inappropriate social behavior." Nothing in the record supported the ALJ's finding that claimant's "poor social functioning was volitional," instead of resulting from her mental impairments.).

Because the Court finds remand is warranted because Plaintiff's newer treatment records cast doubt on the existence of substantial evidence supporting the RFC, it does not address Plaintiff's remaining arguments on appeal.

## VI. CONCLUSION

For the reasons given below, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED** and that the Commissioner's decision be **VACATED** and **REMANDED** for further proceedings consistent with this opinion.[5]

Signed in Baton Rouge, Louisiana, on August 31, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[5] Contrary to the Court's Order (R. Doc. 5), Plaintiff filed a Motion for Summary Judgment as opposed to a Memorandum in Support of Appeal. (R. Doc. 12). Plaintiff's Motion requests the Court to reverse the ALJ's decision and award benefits, or alternatively, to remand for a re-hearing. For the reasons set forth herein, the Court recommends that the pending Motion be granted and the matter remanded for further proceedings consistent with this opinion.